**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**RONALD LEE WILLIAMS,**

      **Petitioner,**

**vs.**

                                        **CASE NO. 3:08cv308-LC/WCS**

**WALTER McNEIL,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

      This is a petition for writ of habeas corpus filed by Ronald Lee Williams pursuant to 28 U.S.C. § 2254. Doc. 2. Petitioner challenges his convictions for first degree murder (four counts), attempted first degree murder (one count), and kidnapping (six counts). The convictions were in the Circuit Court of the First Judicial Circuit, in and for Escambia County, Florida, case number 1990 CF 003515A. *Id.* Petitioner was sentenced to death. In 2008, the death sentence was reduced to a life in prison. Williams v. State, 987 So. 2d 1 (Fla. 2008). Respondent filed an answer and the record in paper form. Doc. 20. Petitioner has not filed a traverse.

Respondent states that the petition appears to have been timely filed.  Doc. 20,

p. 24.  Respondent also has addressed the merits of a number of claims, agreeing that

Petitioner exhausted his state court remedies as to each.  Respondent argues that

several claims (grounds four, five, and nine) are moot and that one claim (ground six)

was not exhausted.

**Summary of the trial evidence**

A summary of the evidence was set forth in <u>Williams v. State</u>, 622 So. 2d 456

(Fla. 1993).  Petitioner has not argued that this is not an accurate summary of the

evidence:

> The evidence establishes that Williams ran a drug trafficking ring from
> Miami that extended from Miami to Pensacola.  In September of 1988,
> Bruce Frazier, who oversaw Williams' Pensacola operation, became
> concerned that his ex-girlfriend would alert the police to the drug ring.
> Bruce Frazier and Michael McCormick, a street-level employee, moved a
> safe containing cocaine and money from one of the apartments used in
> the drug business to Michael McCormick's apartment.  During a telephone
> conversation, Williams told Bruce Frazier to go to McCormick's apartment
> to obtain other money that McCormick owed Williams.  Upon reaching the
> apartment, McCormick informed Bruce Frazier that the money he owed
> Williams and the safe they had just moved from Bruce Frazier's apartment
> had been stolen.  Bruce Frazier called Williams and informed him of the
> situation and the fact that there were no visible signs of a forced entry into
> McCormick's apartment.  Bruce Frazier testified that Williams allegedly
> stated that he was sending some people up to Pensacola to get the
> money and drugs back.
>
> On September 19, 1988, Williams sent Timothy Robinson, Bruce Frazier's
> brother Darrell Frazier, and Michael Coleman from Miami to Pensacola to
> begin a search for the missing cocaine and money.  These individuals met
> McCormick and Bruce Frazier at a hotel in Pensacola and went to
> McCormick's apartment.  After obtaining several weapons from
> McCormick, they went to the apartment next door and forced their way in.
> In the apartment were Darlene Crenshaw, Amanda Merrill, Derek Hill, and
> Morris Alfonso Douglas.  Mildred Baker, McCormick's girlfriend, was
> brought in shortly thereafter.  Hill, Merrill, Baker, and Douglas were
> ordered to take their clothes off.  They were then bound and gagged, and

made to lie on the floor. The four men then began interrogating the prisoners. After his demands regarding the whereabouts of the money and cocaine went unanswered, Robinson began stabbing Hill. Meanwhile, the other accomplices physically assaulted some of the other hostages with kitchen knives found in the apartment.

At this point, Darlene Crenshaw stated that she knew where the stolen contraband was and that McCormick was involved in the theft. After Crenshaw's revelation, McCormick was also stripped, tied up, and stabbed several times. The Fraziers took Crenshaw to her apartment where they retrieved the cocaine and cash. The Fraziers left Crenshaw at her apartment and returned to Hill's apartment.

Meanwhile, at Hill's apartment, Mildred Baker and Amanda Merrill were repeatedly raped by Robinson and Coleman. The men were apparently stabbed and slashed several more times. Once the Frazier brothers returned, Coleman and Robinson systematically began killing the prisoners. All of the prisoners except Merrill died at the scene. Coleman first slashed Merrill's throat several times. Someone then shot Merrill in the back of the head. After the men left, Merrill was miraculously able to free herself and call 911.

At the trial, Darlene Crenshaw, Amanda Merrill, and Bruce and Darrell Frazier testified for the State. It was undisputed that Williams was in Miami at the time the crimes were committed and did not shoot or stab any of the victims himself.

Darlene Crenshaw testified that Hill and Douglas had taken the safe, left it at her house, and returned on the morning of September 19, 1988, in order to open it. A portion of the money and drugs in the safe was left at her house. She testified that, later that evening while she was at Hill's apartment with Merrill, Douglas, and Hill, three armed men forced their way into the apartment and demanded the return of their "stuff." A fourth man brought in Mildred Baker a few minutes later. Crenshaw stated that one of the Fraziers kept demanding his "stuff." After telling the Fraziers that she knew where the money and drugs were, she was allowed to dress. On the way to her house, one of the Fraziers stated that he only wanted his "stuff" and that Crenshaw would not be hurt. One of the Fraziers then allegedly stated that he would "take care of the guys." She testified that, once they had located the stolen contraband, the Fraziers left her at her house.

Amanda Merrill testified that after Crenshaw had been taken away by the Fraziers, Robinson began physically and verbally abusing Douglas and Hill, and that she was repeatedly raped. She testified that soon thereafter

she heard someone come into the apartment and say, "We got what we want. Come on, let's go." She stated that another person then said, "No, I'm going to do this." Merrill then stated that she heard a gunshot and heard Mildred Baker begging not to be killed. She stated that she heard Robinson say, "Get down, bitch," and that a shot rang out. Coleman then entered the room and cut Merrill's throat. Coleman later cut her throat two more times. Finally, she stated that someone entered the room and shot her in the back of the head.

Bruce Frazier testified that in February, 1988, he established a drug operation for Williams in Pensacola. He rented an apartment where he kept a safe containing money and drugs. He testified that the entire episode began when he suspected that his ex-girlfriend would alert the police to the operation. Bruce Frazier testified that, after going to McCormick's apartment, they went next door and forced their way in. Frazier also stated that, as he and Darrell were leaving with Darlene Crenshaw, Robinson told him to "kill the girl" if the police got behind them. He testified that, upon returning to McCormick's apartment, he saw a girl lying on the bed with her throat cut and Derek Hill lying on the floor with his throat cut, and that McCormick had been stabbed in the back. Bruce Frazier testified that his brother Darrell stated that they had gotten what they came for. Robinson commented that they had one more thing to take care of before they left. Bruce Frazier stated that Coleman then shot McCormick in the head. Bruce stated that he then left the apartment, followed shortly afterwards by his brother Darrell. Bruce Frazier explained that, at this point, he heard two more shots and then saw Coleman and Robinson leave the apartment. He testified that, upon returning to Miami, he met with Williams, Darrell Frazier, and Gwen Cochran; that Cochran stated that she could be charged as an accessory to murder; and that Williams replied that he could "get the most time" because he ordered the people to be killed. Bruce Frazier concluded his testimony by stating that his intent had been to merely investigate the theft, and get the money and drugs back.

Darrell Frazier testified that, during the several days prior to the murders, he, Williams, Coleman, and Robinson met several times to discuss the theft and at one meeting Williams stated that, if McCormick was involved with the theft, he should be "dropped." Darrell Frazier testified that Williams ordered them to "drop" whoever was involved with the theft of his money and drugs. Darrell also testified that, after returning from Crenshaw's house, he told Robinson, "Let's go man. We got what we came for," and that Coleman responded "No, man, the nigger told us we got to drop them, man." Darrell testified that, upon being advised that Crenshaw had been released, Williams told Darrell that he had "fucked up. [He] shouldn't have did that." Darrell Frazier also stated that, upon

returning to Miami, Williams paid him, Robinson, and Coleman $9,000
each and paid Bruce Frazier $3,000.

During the trial, the State introduced evidence pertaining to two drive-by
shootings that occurred in Jacksonville several months before the incident
in Pensacola.  Bruce Frazier testified that, in 1988, Vernon McClendon, an
employee from whom Williams rented a house where drugs were sold,
decided to end his association with Williams and start his own drug
operation.  Bruce Frazier stated that McClendon had not taken anything
that belonged to Williams but that, nevertheless, Williams decided that
McClendon should be killed.  Frazier further testified that he, Williams,
Timothy Robinson, and Kelvin McKinney traveled to Jacksonville, bought
several automatic weapons with Williams' money, and attempted to kill
McClendon and his girlfriend, Honey Rose Hurley.  Frazier testified that
Williams had ordered that they kill McClendon.  Another witness, Rufus
Williams, testified that Ronald Williams had ordered them to "drop"
McClendon in order to avoid competition.  Frazier testified that, as Hurley
approached a toll booth, he pulled alongside her car and Robinson shot
her several times.  They also shot McClendon in a similar drive-by fashion.

622 So. 2d at 458-460.

## Section 2254 Standard of Review

A petitioner is entitled to federal habeas relief only if the state court's adjudication

of the merits of the federal claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States;  or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
court proceeding.

§ 2254(d); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146  L.Ed.2d 389

(2000); Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125

(2000).

For an ineffectiveness of counsel claim, the "clearly established" standard is set

forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Under <u>Strickland</u>, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.

**Ground one**

Petitioner contends that his trial attorney was ineffective for failing to request an instruction of "independent act."  Doc. 2, p. 6.  The Florida Supreme Court rejected this claim.  That Court reasoned:

> In *Lovette v. State*, 636 So. 2d 1304 (Fla.1994), this Court addressed a similar claim.  Specifically, in that case, Lovette and his codefendant, Wyatt, escaped from prison and fled.  *Id.* at 1305.  While on the run, they robbed a Domino's store, holding an employee, the store manager, and his wife at gunpoint.  *Id.*  Lovette thought his codefendant was going to lock the robbery victims in a closet, but instead, he heard gunshots.  *Id.* at 1306.  The two then fled the store in a stolen car.  *Id.*  At trial, Lovette requested an instruction on independent acts, alleging that he should not be held responsible for the murders since they were outside the common design of the robbery.  *Id.*  The trial court denied the request, and this Court affirmed, stressing that "[o]ne who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime."  *Id.* (*quoting Jacobs v. State*, 396 So. 2d 713, 716 (Fla. 1981)).  Thus, even though Lovette did not fire the shots that killed the victims or agree to the murders, we concluded the evidence did not support an independent act instruction as to the murders because the evidence demonstrated Lovette was a willing participant in the robbery and the killings furthered the robbery in that they assisted the robbery's execution and lessened the immediate detection of the robbery.  *Id.* at 1307.
>
> Williams' sole basis to support his assertion that the independent act theory should apply to his case is based on the fact that he was not in Pensacola at the time of the killings but simply sent the codefendants to Pensacola to bring back his drugs and money; thus, the killings were the independent acts of the codefendants.  However, as a perpetrator in the underlying felony, as in *Lovette*, Williams is deemed a principal in any crime committed to further the initial common criminal design.  Here, it is apparent that the murders furthered the commission of the underlying felonies, by helping the codefendants locate the missing money and drugs and helping the codefendants elude detection after they recovered the

drugs and money. Williams has failed to show how his counsel could be ineffective in failing to request a jury instruction which did not apply to the facts of this case. In addition, it is apparent that Williams was charged with the murders because of his role in ordering the killings, and the jury rejected his denial of such a role. Hence, the jury implicitly rejected any claim of independent act.

987 So. 2d at 7.

Thus, the Florida Supreme Court squarely ruled that the jury instruction was not appropriate under state law in Petitioner's case, and that settles the state law issue. Herring v. Secretary, Dept. of Corrections, 397 F.3d 1338, 1354 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005). Petitioner's attorney could not have committed attorney error for failing to request a jury instruction that was not appropriate under state law. Consequently, Petitioner has not shown that the Florida Supreme Court's adjudication of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Ground two**

Petitioner asserts that he was denied the effective assistance of counsel because his trial attorney "improperly injected his personal beliefs in opening and closing arguments to the jury that defendant deserved to be in prison." Doc. 2, p. 8. Petitioner's attorney pointed out to the jury that "cocaine is a big problem in our community," and Petitioner had already been tried and found guilty of involvement with cocaine. Doc. 20, p. 45 (summarizing the argument). Counsel said that Petitioner was "in prison right now, where personally I think he needs to be, for that conviction. He is not on trial for being a cocaine trafficker. He is on trial today for being a murderer." *Id.*

Counsel further pointed out that Petitioner was already serving 30 years in prison for drugs, so "please don't find him guilty of murder because he's a drug trafficker."  *Id.* Counsel argued that Plaintiff had plenty of money, "incredible amounts of money.  Why would he ruin it by having four people killed over 8,000 bucks?"  *Id.*, p. 46.

In denying this claim of ineffectiveness, the Florida Supreme Court noted that Petitioner's attorney had argued that it would have been ridiculous for Petitioner to risk "$90,000 a week to have somebody killed over theft of a mere $8000."  987 So. 2d at 8. The Court reasoned:

> Moreover, defense counsel was clearly aware that the jury would be inclined to punish the defendant for being a drug dealer and thus aptly pointed out that the defendant was already serving a significant amount of time for this crime.  Counsel even found a way to argue that the defendant's illegal activities would make it less likely that he ordered the codefendants to kill the victims.  As this Court has stressed numerous times, "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."  *Occhicone v. State*, 768 So.2d 1037, 1048 (Fla. 2000). We agree with the trial court that Williams has not shown how his counsel was ineffective relative to this claim and thus is not entitled to relief.

*Id.*

In <u>Yarborough v. Gentry</u>, 540 U.S. 1, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003), defense counsel argued:

> The question is, did he intend to stab her?  He said he did it by accident. If he's lying and you think he's lying then you have to convict him.  *If you don't think he's lying, bad person, lousy drug addict, stinking thief, jail bird, all that to the contrary, he's not guilty.*  It's as simple as that.  *I don't care if he's been in prison.  And for the sake of this thing you ought not care* because that doesn't have anything to do with what happened on April 30th, 1994.

540 U.S. at 3, 124 S.Ct. at 3 (emphasis added). The Court found this particular portion

of the final argument to have been the result of sound trial strategy:

> While confessing a client's shortcomings might remind the jury of facts
> they otherwise would have forgotten, it might also convince them to put
> aside facts they would have remembered in any event. This is precisely
> the sort of calculated risk that lies at the heart of an advocate's discretion.
> By candidly acknowledging his client's shortcomings, counsel might have
> built credibility with the jury and persuaded it to focus on the relevant
> issues in the case. *See* J. Stein, CLOSING ARGUMENT § 204, p. 10
> (1992-1996) ("[I]f you make certain concessions showing that you are
> earnestly in search of the truth, then your comments on matters that are in
> dispute will be received without the usual apprehension surrounding the
> remarks of an advocate"). As Judge Kleinfeld pointed out in dissenting
> from denial of rehearing en banc, the court's criticism applies just as well
> to Clarence Darrow's closing argument in the Leopold and Loeb case: " 'I
> do not know how much salvage there is in these two boys. . . . [Y]our
> Honor would be merciful if you tied a rope around their necks and let them
> die; merciful to them, but not merciful to civilization, and not merciful to
> those who would be left behind.' " 320 F.3d, at 895 (quoting FAMOUS
> AMERICAN JURY SPEECHES 1086 (F. Hicks ed. 1925) (reprint 1990)).

540 U.S. at 9-10, 124 S.Ct. at 6-7. To like effect is <u>Florida v. Nixon</u>, 543 U.S. 175, 125

S.Ct. 551, 160 L.Ed.2d 565 (2004), which held that counsel's concession of guilt at the

outset of a capital case was not ineffective assistance of counsel because it was a

reasonable strategy to try to avoid the death penalty.

These Supreme Court cases clearly establish the law applicable in this case.

The argument made by Petitioner's counsel was well within the permitted range for

sound trial strategy. Consequently, Petitioner has not shown that the Florida Supreme

Court's adjudication of this claim "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of

the United States." § 2254(d)(1).

**Ground three**

Petitioner contends his attorney was ineffective for failing to object to the prosecutor's closing argument. The prosecutor argued:

> That's who it was. Everybody knew it, undisputed, uncontroverted. Nobody took the witness stand and said, oh, no, they belonged to Jit, they belonged to Yoge. No, nobody said that. Every single witness knew who the boss was.

Record (2 of 6) Tab F, R. 827-828. Petitioner contends that this was an inappropriate comment upon Petitioner's failure to testify. Doc. 2, p. 10.

"In *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court declared that the Fifth Amendment 'forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.' *Id.* at 615, 85 S.Ct. 1229." United States v. Thompson, 422 F.3d 1285, 1298 (11th Cir. 2005), *cert. denied*, 549 U.S. 1087 (2006). "*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." United States v. Robinson, 485 U.S. 25, 32, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976)). The challenged prosecutorial comment, however, "must be examined in context." 485 U.S. at 33, 108 S.Ct. at 869.

Thus, in United States v. Sorzano, 602 F.2d 1201 (5th Cir. 1979), *cert. denied*, 444 U.S. 1018 (1980), the former Fifth Circuit held:

> It is well settled that direct comment by the prosecution regarding the failure of an accused to testify is forbidden under the Fifth Amendment. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Appellants here object to statements made by the prosecutor in closing argument that certain testimony offered by its witnesses was uncontradicted. As we said in *Jennings v. United States*, 527 F.2d 862, 871 (5th Cir. 1976), "*(I)t is well established that one may point out that the testimony of witnesses is uncontradicted (citations omitted), particularly*

> *where someone other than the defendant could have offered contrary
> evidence.* (citations omitted)  The test we must apply is 'whether or not the
> statement was manifestly intended or was of such character that a jury
> would naturally and necessarily take it to be a comment on the failure of
> the accused to testify.'  *United States v. Wilson*, 500 F.2d 715, 721 (5th
> Cir. 1974), *Cert. denied*, 420 U.S. 977, 43 L.Ed.2d 658, 95 S.Ct. 1403
> (1975)."  Of course to determine the manifest intent and the natural and
> necessary effect of such statements, we must examine them in context.
> *United States v. Austin*, 585 F.2d 1271, 1279 (5th Cir. 1978).

602 F.2d at 1202 (emphasis added).

In rejecting this claim, the Florida Supreme Court noted that it would be improper
to comment upon the "uncontradicted" state of the evidence where the defendant is the
only one who can contradict it.  987 So. 2d at 8 (citing Rodriguez v. State, 753 So. 2d
29 (Fla. 2000), decided after Petitioner's trial).  The Court said that Petitioner was not
the only person who could have contested the assertion that he was the head of the
drug operation.  *Id.*, at 9.

This determination is supported by the record.  Just before making this remark,
the prosecutor also commented that seven witnesses "said the money and the drugs
belonged to" Petitioner.  Record (2 of 6) Tab F, R. 827.  Any one of those witnesses
could have contradicted the assertion.  In context, the comment did not suggest to the
jury that it could consider Petitioner's silence as evidence of guilt.  Therefore, Petitioner
has not shown that the Florida Supreme Court's adjudication of this claim "was contrary
to, or involved an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States."  § 2254(d)(1).

**Grounds four, five, and nine**

These are claims of ineffective assistance of counsel during the penalty phase.
Ground four argues that the trial judge sentenced the co-defendants to death after the

jury recommended they receive life sentences.  Petitioner argues that after the jury

recommended a life sentence in his case, his attorney was ineffective for failing to seek

the disqualification of the trial judge for sentencing.  Doc. 2, p. 11.  Ground five asserts

that his attorney was ineffective at sentencing for failing to present mitigating factors

contained in a psychological report.  *Id.*, p. 13.  Ground nine argues that the trial judge

violated Sixth Amendment right to a jury trial as determined in Ring v. Arizona, 536 U.S.

584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Apprendi v. New Jersey, 530 U.S. 466,

490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Blakely v. Washington, 542 U.S. 296,

124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), because the trial judge overrode the jury

recommendation that a life sentence be imposed.  *Id.*, p. 20.

These claims are moot.  The Florida Supreme Court granted relief, vacating the

death sentence and imposing a life sentence.  *See* Lane v. Williams, 455 U.S. 624, 102

S.Ct. 1322, 71 L.Ed.2d 508 (1982) (habeas challenge to three-year term of mandatory

parole was moot because petitioners had completed serving term of imprisonment and

were no longer subject to any parole terms).

**Ground six**

Petitioner contends that he was denied effective assistance of trial counsel because his attorney did not ask for and obtain co-counsel to assist.  Doc. 2, p. 15. Petitioner argues that the case was complex and two attorneys were needed.  *Id.*

Respondent argues that this claim is procedurally defaulted because it was not raised in the Rule 3.850 proceedings.  Doc. 20, p. 62.  As a claim faulting trial counsel for failing to obtain help, Respondent is correct.  However, Petitioner did claim in his Rule 3.850 motion that by having only one attorney at trial, he was denied effective representation.  Record (5 of 6) Tab FF, R. 580.  He argued that this violated the recommendation of the American Bar Association (to have two lawyers in a death case).  *Id.*  He also claimed that his attorney, as a consequence, was ineffective for failing to present "evidence of mental mitigation."  *Id.*  This claim, such as it was before the state court, is not defaulted.

The Florida Supreme Court read this claim as presenting only a state law issue, whether co-counsel should automatically be appointed in a death case.  987 So. 2d at 14.  The Court declined to so rule, finding FLA. R. CRIM. P. 3.112(e), which gives the trial court discretion, to be sufficient.  *Id.*

Consequently, the claim made in the Rule 3.850 motion did not present a federal claim except insofar as it faulted trial counsel at sentencing for failing to present mitigating evidence.[1]  Petitioner did not then, and does not now, cite any case for the

---

[1] Procedural default is irrelevant when, as here, a federal claim is not presented. Engle v. Isaac, 456 U.S. 107, 121, n. 19, 102 S.Ct. 1558, 1568, n. 19, 71 L.Ed.2d 783 (1982) (rejecting argument that insufficiency of claim demonstrated lack of prejudice due to procedural default: "If a state prisoner alleges no deprivation of a federal right, §

proposition that failure to comply with a recommendation of the American Bar Association, that two attorneys represent a person facing the death penalty, violates the federal constitution. A failure to have two lawyers at a trial is not a Sixth Amendment violation, in the abstract. It would become a Sixth Amendment violation only to the extent that it caused specific attorney error and prejudice to the outcome.[2]

To the extent that this clam can be read as presenting an exhausted claim that the lack of two lawyers caused Petitioner's lawyer to be ineffective at sentencing with respect to presentation of mitigating evidence, that claim is moot as discussed above. The death penalty was vacated. For these reasons, ground six affords no relief.

**Ground seven**

Ground seven asserts that Petitioner was deprived of effective assistance of counsel by the cumulative errors alleged in grounds one through six. Doc. 2, p. 17. A claim of cumulative ineffectiveness fails if the individually alleged instances of ineffectiveness are without merit. Sims v. Singletary, 155 F.3d 1297, 1309 (11th Cir.

---

2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts").

[2] "A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland v. Washington, 466 U.S. at 690, 104 S.Ct. at 2066. "Conclusory allegations of ineffective assistance are insufficient." Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992) (drug quantity at sentencing, failure to allege specific facts), *quoting*, United States v. Lawson, 947 F.2d 849, 853 (7th Cir. 1991) (same); Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986) (defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel); Bolder v. Armontrout, 921 F.2d 1359, 1363-1364 (8th Cir. 1990), *cert. denied*, 502 U.S. 850 (1991); United States v. Vargas, 920 F.2d 167, 169-170 (2d Cir. 1990), *cert. denied*, 502 U.S. 826 (1991).

1998), *cert. denied*, 527 U.S. 1025 (1999). *Cf.*, <u>United States v. Culver</u>, 598 F.3d 740, 751 (11th Cir. 2010) (doctrine of cumulative trial error does not apply where the trial court commits no individual errors, citing <u>United States v. Waldon</u>, 363 F.3d 1103, 1110 (11th Cir.2004)). Ground seven affords no relief.

**Ground eight**

This claim is difficult to understand. It alleges ineffective assistance of *trial* counsel. It then asserts that Petitioner filed a motion to recuse the trial judge who heard his Rule 3.850 motion (who was also the judge who overrode the jury recommendation for a life sentence). I read the claim as did the Florida Supreme Court, that it was error for the Rule 3.850 judge to fail to recuse himself. That Court ruled on state law grounds, finding that the fact that the particular judge had imposed the death penalty, overriding the jury recommendation, was not by itself sufficient to cause his recusal in postconviction proceedings. 987 So. 2d at 15.

In any event, ground eight fails to state a federal claim. Defects in a collateral proceeding are unrelated to the actual cause of petitioner's custody, and do not state a basis for habeas corpus relief. <u>Quince v. Crosby</u>, 360 F.3d 1259, 1261-1262 (11th Cir.), *cert. denied*, 543 U.S. 960 (2004), citing <u>Spradley v. Dugger</u>, 825 F.2d 1566, 1568 (11th Cir. 1987). <u>Quince</u> specifically held that a failure of the Rule 3.850 judge to recuse himself does not state a federal claim. Ground eight provides no relief.

**Certificate of Appealability**

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a

certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2254 11(b).

I find no substantial showing of the denial of a constitutional right. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

**Conclusion**

Accordingly, it is **RECOMMENDED** that the 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Ronald Lee Williams challenging convictions for first degree murder (four counts), attempted first degree murder, and kidnapping (six counts), in the Circuit Court of the First Judicial Circuit, in and for Escambia County, Florida, case number 1990 CF 003515A, be **DENIED WITH PREJUDICE** and that a certificate of appealability be **DENIED** pursuant to § 2254 Rule 11(a).

**IN CHAMBERS** at Tallahassee, Florida, on November 19, 2010.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

Case No. 3:08cv308-LC/WCS

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.